# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZAIGANG LIU, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | )  **C.A. NO. 07-263 (EGS)** |
| PAUL NOVAK, DIRECTOR, VERMONT | ) |
| SERVICE CENTER, U.S. DEPARTMENT OF | ) |
| HOMELAND SECURITY (DHS), U.S. | ) |
| CITIZENSHIP AND IMMIGRATION | ) |
| SERVICES (USCIS); EMILIO GONZALES, | ) |
| DIRECTOR USCIS; ROBERT MUELLER, | ) |
| DIRECTOR, FEDERAL BUREAU OF | ) |
| INVESTIGATION (FBI), | ) |
| | ) |
| **Defendants.** | ) |

## DEFENDANTS' MOTION TO DISMISS

COME NOW, the above-named Defendants, by and through their attorney, the United States Attorney for the District of Columbia, and respectfully move this Court to dismiss this case for lack of jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(1) and (6).  In support of this Motion, Federal Defendants refer the Court to the accompanying memorandum of points and authorities.  A proposed Order consistent with this Motion also is attached.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

                     /s/
_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


                     /s/
_____
ALEXANDER D. SHOAIBI, D.C. Bar #423587
Assistant United States Attorney
555 4th Street, N.W. Rm. E 4218
Washington, D.C. 20530

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZAIGANG LIU,                                              ) | |
|                                                                   ) | |
|     **Plaintiff,**                     ) | |
|                                                                   ) | |
|     **v.**                                ) | |
|                                                                   ) | **C.A. NO. 07-263 (EGS)** |
| **PAUL NOVAK, DIRECTOR, VERMONT**  ) | |
| **SERVICE CENTER, U.S. DEPARTMENT OF** ) | |
| **HOMELAND SECURITY (DHS), U.S.**      ) | |
| **CITIZENSHIP AND IMMIGRATION**        ) | |
| **SERVICES (USCIS); EMILIO GONZALES,** ) | |
| **DIRECTOR USCIS; ROBERT MUELLER,**  ) | |
| **DIRECTOR, FEDERAL BUREAU OF**       ) | |
| **INVESTIGATION (FBI),**                     ) | |
|                                                                   ) | |
|     **Defendants.**                  ) | |

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

Defendants Paul Novak, Director, Vermont Service Center, U.S. Department of

Homeland Security, et al., respectfully move to dismiss the Complaint for Writ of Mandamus

filed by the Plaintiff in the above-captioned matter.

## I.    FACTUAL BACKGROUND

Plaintiff is a national of China who now lives in Midlothian, Virginia in the United

States.  See Complaint at ¶ 3.  On July 23, 2003, plaintiff filed an application for adjustment of

status to permanent resident with USCIS on Form I-485. See Declaration of Bradley J.

Brouilettte, Supervisory Center Adjudications Officer, Vermont Service Center of USCIS,

attached as Exhibit 1, ¶ 14.  On November 23, 2004, plaintiff's spouse's Application for

Adjustment of Status to lawful permanent residence was approved by the United States

Citizenship and Immigration Services (USCIS).  Id. at ¶ 7.  Plaintiff seeks adjustment of status as

a derivative beneficiary of his spouse's approved employment based petition.  Id. and Complaint at ¶¶ 7 and 8.

Plaintiff's application for adjustment remains pending the completion of  mandatory criminal and national security background checks, including the FBI name check received by the FBI from USCIS on March 30, 2004.  Exhibit 1 at ¶ 14 and Declaration of Michael A. Cannon, Section Chief at the Headquarters of the FBI in Washington, D.C., attached as Exhibit 2, at ¶ 22.

The FBI name check process is detailed and set forth both in the fact sheet attached to the Declaration of Bradley Broulette and in the Declaration of Michael A. Cannon.  See April 25, 2006 Fact Sheet attached to Exhibit 1, and Exhibit 2, ¶¶ 17-22.  These documents clearly set forth the security checks that USCIS must complete prior to approval of any application.  These fact sheets demonstrate that, although the vast majority clear quickly, FBI name checks can remain pending on applicants for longer periods of time, but that such delays involve only approximately one percent of the USCIS applications received each year.  See id.

USCIS is mandated to perform and await favorable completion of the national security FBI name check, and is mandated to have all background checks current and favorably resolved prior to approval of any application.  See Exhibit 1 at ¶¶ 3 and 4.; see also Public Law 103-317, 108 Stat. 1724, Aug. 26, 1994, which in part amended 8 U.S.C. § 1255, by mandating that "The Immigration and Naturalization Service shall conduct full fingerprint identification checks through the Federal Bureau of Investigation for all individuals over sixteen years of age adjusting immigration status in the United States pursuant to this section."

USCIS monitors all pending FBI name check cases regularly in order to identify those in which a response from the FBI has been received.  Exhibit 1 at ¶ 9. These audits occur at least every three weeks.  See id.  However, because of the large number of security checks conducted

by USCIS and the need to await responses from other agencies conducting the required inquiries, delays are unavoidable and can be lengthy.  When a security check reveals the existence of derogatory information, it often will not indicate the substance of that information in the possession of another agency.  USCIS will then have to work with other agencies concerning this information in order to evaluate its significance properly. If USCIS receives any derogatory information, USCIS is mandated to investigate and resolve that derogatory information prior to completion of the application adjudication.  See id. at ¶ 10.

On February 5, 2007, Plaintiffs filed the instant Complaint for Mandamus against Defendants, seeking to compel Defendants to adjudicate Plaintiff's application for lawful permanent residence.  See Complaint at ¶ 2.  The action is also brought against Defendants to compel action on a petition for alien relative.  See id.  As Defendants demonstrate below, this case should be dismissed because this Court lacks subject matter jurisdiction, and because the Complaint fails to state a claim upon which relief may be granted.

## II.    STANDARD OF REVIEW FOR MOTION TO DISMISS

The standard to be applied in deciding a motion to dismiss is well-established.  For purposes of deciding whether a Plaintiff has failed to state a cause of action, the factual allegations of the complaint must be taken as true, and all ambiguities or doubts in the factual allegations must be resolved in favor of the pleader.  Caudle v. Thomason, 942 F.Supp. 635, 638 (D. D.C. 1996).  Despite this generous standard, the complaint still must set forth sufficient factual information to suggest that there exists some recognized legal theory upon which relief can be granted.  Id.  A court must dismiss a complaint where, even assuming all the factual allegations are true, Plaintiff has failed to establish a right to relief based upon those facts.  Id.

The Plaintiff bears the burden of establishing the court's subject matter jurisdiction.  See

3

Miller v. United States, 710 F.2d 656, 662 (10th Cir.), *cert. denied*, 464 U.S. 939 (1983); Baird

v. United States, 653 F.2d 437, 440 (10th Cir. 1981), *cert. denied*, 454 U.S. 1144 (1982).  In

deciding a motion under Rule 12(b)(1), the Court may go beyond the allegations of the

Complaint.  See Land v. Dollar, 330 U.S. 731, 735 n. 4 (1947); Herbert v. National Academy of

Sciences, 974 F.2d 192, 197-98 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C.

Cir. 1987); Bonterra America, Inc. v. Bestmann, 907 F.Supp. 4, 5 n.1 (D.D.C. 1995); Kuffel v.

United States Bureau of Prisons, 882 F. Supp. 1116, 1120 (D.D.C. 1995).  Additionally, a court

may properly take judicial notice of court records without converting a motion to dismiss into a

motion for summary judgment.  E.g., Baker v. Henderson, 150 F.Supp.2d 17, 19 n. 1 (D.D.C.

2001) (""in determining whether a complaint fails to state a claim, the court may take judicial

notice of matters of a general public nature, such as court records, without converting the motion

to dismiss into one for summary judgment.");  Himmelman v. MCI Communications, 104

F.Supp.2d 1, 3 (D.D.C. 2000) ("[t]he court may consider [on a motion to dismiss] the allegations

of the complaint, documents attached to or specifically referred to in the complaint, and matters

of public record.").  This is so because a motion under Rule 12(b)(1) "calls into question the

court's power to hear the plaintiff's claim ... and therefore imposes upon courts an affirmative

obligation to ensure that they are acting within the scope of their jurisdictional power."  5A

Wright & Miller, Federal Practice & Procedure 2d § 1350; see also District of Columbia

Retirement Bd. v. United States, 657 F.Supp. 428, 431 (D.D.C.1987).  Accordingly, the Court

need not limit itself to the allegations of the Complaint in deciding a 12(b)(1) motion.  Instead,

"the Court may consider the complaint supplemented by undisputed facts evidenced in the record

... plus the court's resolution of disputed facts."  Herbert v. National Acad. of Sciences, 974 F.2d

192, 197 (D.C. Cir.1992).

4

A motion to dismiss under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In making determinations on a motion to dismiss under Rule 12(b)(6), a court must view facts alleged in the complaint in the light most favorable to the plaintiff.  Id.; see also Nix v. Hoke, 139 F.Supp.2d 125, 131 (D.D.C. April 2001) (citing, Weyrich v. The New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001)), and Slaby v. Fairbridge, 3 F. Supp. 2d 22, 27 (D.D.C. 1998).  In this case, Plaintiff fails to establish a right to relief on the claims asserted, even when accepting the facts he alleges as true.

## III.    ARGUMENT

### A.    Applications For Adjustment Of Status

Section 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255, authorizes USCIS to adjust to permanent residence status certain aliens who have been admitted into the United States.  Adjustment of status is subject to a favorable exercise of discretion.  Section 245(a) provides:

> The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time of his application.

8 U.S.C. § 1255(a) (emphasis added).  Significantly, the statute does not set forth any time frame in which a determination must be made whether to adjust an alien's status.

The procedures for admitted aliens to apply for adjustment of status are set forth at 8 C.F.R. § 245.  The regulations do not establish any time frame in which adjudication must occur.

Before a decision is rendered on an alien's I-485 application, USCIS, in conjunction with the Federal Bureau of Investigation (FBI), conducts several forms of security and background checks to ensure that the alien is eligible for the benefit and that he or she is not a risk to national security or public safety. These checks currently include: (a) records checks against the Department of Homeland Security's ("DHS") own immigration systems; (b) an FBI fingerprint check for relevant criminal history records on the alien; (c) a check against the Interagency Border Inspection System (IBIS), which is managed by DHS, and contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (d) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS. See 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States").

**B. Plaintiff's Claim Is Barred**

Plaintiff contends that subject matter jurisdiction exists in this action under 28 U.S.C. §§ 1331, 1361, and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702. Defendant respectfully disagrees. The cited statutory provisions fail to provide a basis for subject matter jurisdiction over Plaintiff's claim. Specifically, the Court lacks subject matter jurisdiction because:

(1) The INA divests courts of jurisdiction over suits where, as here, the Plaintiff seeks judicial review of either an agency's discretionary decision or action, INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).

(2) The INA bars judicial review of "any cause or claim by or on behalf of any alien arising from the decision or action" of the agency to "commence proceedings, adjudicate cases, or execute removal orders," INA § 242(g), 8 U.S.C. §§ 1252(a)(2)(B)(ii), (g).

(3) Mandamus is a remedy, once jurisdiction is properly invoked, not a basis for jurisdiction. Further, mandamus may not issue here because the Plaintiff lacks a clear right to an immediate adjudication of the application to adjust status, and Defendant owes no clear duty to adjudicate the adjustment application prior to the completion of background checks for criminal convictions, immigration fraud, and national security matters.

(4) The Administrative Procedure Act does not provide an independent basis for subject matter jurisdiction to review agency action, but its waiver of sovereign immunity must be coupled with another basis for jurisdiction, such as 28 U.S.C. § 1331. Further, the APA precludes judicial review of agency's discretionary decisions.

**C.      Plaintiff's Complaint Should Be Dismissed Under Rule 12(b)(1) because INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii), and INA § 242(g), 8 U.S.C. § 1252(g), Each Independently Divest this Court of Jurisdiction.**

1.      INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).

The INA contains an express jurisdiction-stripping provision where a litigant seeks review of an adjustment case or any other discretionary decision. In a subsection entitled "Matters not subject to judicial review," INA § 242(a)(2)(B) provides that:

> Notwithstanding any other provision of law (statutory or nonstatutory), section 2241 of title 28, United States Code, . . . and sections 1361 and 1641 of such title, and . . . regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review:
>
> (I)      any judgment regarding the granting of relief under section 212(h), 212(I), 240A, 240B, or 245 [8 U.S.C. § 1255], or
> (ii)     any other decision or action of the Attorney General or the

7

> Secretary of Homeland Security the authority for which is
> specified under this title to be <u>in the discretion of the Attorney
> General or the Secretary of Homeland Security,</u> . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added). <u>See</u> <u>Zhu v. Gonzales</u>, 411 F.3d 292 (D.C. Cir.

2005); <u>Mustafa v. Pasquerell</u>, 2006 WL 488399 (W.D. Tex. Jan 10, 2006); <u>Zahini v. Neufeld</u>,

2006 WL 2246211 (M.D. Fla. June 26, 2006); <u>Blacher v. Ridge</u>, 436 F. Supp.2d 602 (S.D.N.Y.

2006).  Because the adjudication of an adjustment of status application is expressly committed to

the discretion of the Secretary of Homeland Security, 8 U.S.C. § 1252(a)(2)(B)(ii) divests this

Court of subject matter jurisdiction.  Under 8 U.S.C. § 1252(a)(2)(B)(ii), courts are barred from

reviewing any "decision or action" the authority for which is specified as discretionary under

"this title."  In seeking to compel the adjudication of an adjustment of status application under 8

U.S.C. § 1255, Plaintiff's claim falls squarely within the plain meaning of these terms.

First, "this title" refers to Title II of the INA, which is comprised of INA §§ 201 - 294, 8 U.S.C.

§§ 1151 through 1363a, <u>i.e.</u> all INA sections in the 200 series.  Thus, section 245(a), 8 U.S.C.

§1255(a), which grants discretionary authority to adjudicate adjustment of status applications, is

part of Subchapter II.

Second, under INA 245(a), 8 U.S.C. § 1255(a), the "authority" for adjudicating

adjustment of status applications is discretionary.  INA § 245(a), 8 U.S.C. § 1255(a) (emphasis

added), provides:

> The status of an alien who was inspected and admitted or paroled
> into the United States . . . <u>may be adjusted by the Attorney
> General, in his discretion</u>, and under such regulations as he may
> prescribe, to that of an alien lawfully admitted for permanent
> residence if (1) the alien makes an application for such adjustment,
> (2) the alien is eligible to receive an immigrant visa and is
> admissible to the United States for permanent residence, and (3) an
> immigrant visa is immediately available to him at the time his
> application is filed.

INA § 1255(a) "vests USCIS with discretion over the *entire* process of adjustment application adjudication. As such, § 1252(a)(2)(B)(ii) precludes judicial review of any 'action,' meaning any act or series of acts, included within the ongoing adjudication process and the pace at which that action proceeds." Safadi v. Howard, 466 F.Supp.2d 696, 700 (E.D.Va. 2006)(emphasis in original) (nearly 4 years had passed in processing plaintiff's pending application for adjustment of status); accord Wilkinson-Okotie v. U.S. Dept. of Homeland Security, 2006 WL 2792405 at 3 (S.D. Tex. Sept. 26, 2006)("Discretionary decisions involving applications for adjustment of status under 8 U.S.C. § 1255 are expressly included within the jurisdiction-stripping provision found in § 1252(a)(2)(B)(I)."); Khalifa v. USCIS, 2006 WL 3609925 at 4 (M.D. Fla. Oct. 10, 2006)(the adjustment statute, 8 U.S.C. § 1255, "expressly places the adjustment of immigration status within the 'discretion' of the Attorney General,'").

The Supreme Court has also determined that "adjustment of status," through which an alien in the United States may apply for permanent resident status, "is a matter of grace, not right…." Elkins v. Moreno, 435 U.S. 647, 667 (1978). See also Wallace v. Gonzales, 463 F.3d 135, 136 (2nd Cir. 2006). Absent "adverse factors, adjustment will ordinarily be granted, still as a matter of discretion." Elkins v. Moreno, at 667 (quoting Matter of Arai, 13 I. & N. Dec. 494, 496 (1970)) (emphasis altered). See also, Daud v. Gonzales, 2006 WL 347712 at 8 (3rd Cir. Dec. 5, 2006) ("The decision to grant or deny an adjustment of status pursuant to § 1255 is a discretionary one . . . [t]herefore we are without jurisdiction to review Daud's challenge to the BIA's denial of discretionary relief . . .").

Plaintiff is also seeking judicial review of both an agency decision and agency action. USCIS has made a decision that it cannot immediately adjudicate Plaintiff's application because the background checks are incomplete, and has acted to withhold adjudication of the adjustment

application until these checks have cleared.  The <u>Safadi</u> Court stated that "under §

1252(a)(2)(B)(ii) the term 'action' encompasses *any* act or series of acts that are discretionary

within the adjustment of status process."  466 F.Supp.2d at 699 (emphasis in original).  Since "§

1255(a) does not impose any limits on USCIS's discretionary authority over the adjustment of

status process, it is clear that 'action' in § 1252(a)(2)(B)(ii) encompasses the entire process of

reviewing an adjustment application, including the completion of background and security

checks and the pace at which the process proceeds."  <u>Id.</u>   The pertinent regulations support the

USCIS's discretionary decision to withhold adjudication until the completion of the necessary

background checks, to ensure the alien's eligibility for adjustment of status or other immigration

benefit.  8 C.F.R. § 103.2(b)(7); 8 C.F.R. § 103.2(b)(18).  <u>See</u> <u>Zahani v. Neufeld</u>, 2006 WL

2246211 at 2 (M.D. Fla. June 26, 2006) (8 C.F.R. § 103.2(b)(18) "provides USCIS with

discretion to withhold adjudication of the adjustment of status application.");  <u>Khalifa v. USCIS</u>,

2006 WL 3609925 at 4 (M.D. Fla. Oct. 10, 2006)("USCIS' authority under 8 C.F.R. §

103.2(b)(18) "to withhold adjudication is a decision solely within the discretion of USCIS.").

The regulations clearly afford "wide discretion to [USCIS] in matters pertaining to the

timing of the adjudication of petitions."  <u>Mustafa v. Pasquerell</u>, 2006 WL 488399, *4 (W.D. Tex.

2006) citing, <u>Willis-Gomez v. Meissner</u>, 879 F.Supp. 1120, 1123-24 (W.D. Okla. 1995).   The

investigative process employed for adjustment of status applicants involves agencies outside of

USCIS's control, such as the FBI, and is crucial for the integrity of the immigration laws and the

safety of the United States.  These background checks are designed to prevent granting benefits

to aliens who are ineligible due to criminal history, immigration fraud, or threat to national

security.  <u>Alkenani v. Barrows</u>, 356 F.Supp.2d 652, 657 (N.D. Tex. 2005) (" Nor does the

immigration service have authority to expedite the FBI investigation or give petitioner priority

10

over background checks requested by other agencies. Unfortunately, delays of this nature are inevitable and becoming more frequent in light of heightened security concerns in the post-911 world."). Furthermore, "judicial deference to the Executive Branch is especially appropriate in the immigration context." INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999). A mandamus action simply cannot be used to compel the performance of a discretionary act. Kale v. INS, 37 Fed. Appx. 90; 2002 WL 1022012 (C.A.5 (Tex.)) at *2 .

In sum, because USCIS's decision to continue evaluating Plaintiff's application lie within the discretion of the Attorney General under § 1255(a), this Court lacks subject matter jurisdiction over Plaintiff's claims. It is a well-established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government. See United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982); Mathews v. Diaz, 426 U.S. 67, 81 (1976) ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.").

Congress's specific withdrawal of subject matter jurisdiction from this Court defeats Plaintiff's assertion of general federal question jurisdiction under 28 U.S.C. § 1331 and mandamus jurisdiction under 28 U.S.C. § 1361. See Danilov v. Aguirre, 370 F.Supp.2d 441, 445 (E.D. Va. 2005) (Ellis, J.) ("[I]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction."). Indeed, § 1252(a)(2)(B) expressly states that it applies "notwithstanding . . . [28 U.S.C. §] 1361," and the APA explicitly provides that it does not apply where "statutes preclude judicial review." 5

11

U.S.C. § 701(a)(2).  Because the Court lacks subject matter jurisdiction over this action,

Plaintiff's complaint should be dismissed in its entirety pursuant to Rule 12(b)(1).

b. INA 242(g), 8 U.S.C. § 1252(g).

In addition, INA § 242(g), 8 U.S.C. § 1252(g) bars judicial review in this case.  INA §

242(g) provides that "notwithstanding any other provision of law, no court shall have jurisdiction

to hear any cause or claim by or on behalf of an alien arising from the decision or action of the

Attorney General to commence proceedings, adjudicate cases, or execute removal orders against

any alien under this Act."  In this way, Congress has evinced its intent to protect the agency from

actions that interfere with the prioritizing and adjudication of immigration cases. Congress

intended Section 242(g) to provide some measure of protection to "discretionary determinations,

providing that if they are reviewable at all, they at least will not be made the bases for separate

rounds of judicial intervention outside the streamlined process that Congress has designed."

Reno v. American-Arab Anti-Discrimination Comm, 525 U.S. 471, 485 (1999).

Indeed, litigation would be piecemeal and burdensome if an applicant for adjustment

could: (1)  initially challenge the pace at which USCIS processed the application; then (2)

challenge the denial itself in federal court; (3) raise the adjustment application for review before

an immigration judge in conjunction with removal proceedings; (4) appeal any denial to the

Board of Immigration Appeals; and (5) litigate the adjustment issue again before the Court of

Appeals.  Delay is a goal in and of itself for many immigration litigants, as it affords residence in

the United States.  Oftentimes, successive litigation is the means of choice in achieving this goal.

2.    <u>The Plaintiff's Request for Mandamus Under 28 U.S.C. §1361 Fails because the Defendant does not Owe a Clear, Nondiscretionary Duty to Process the Adjustment of Status Application Prior to Completion of Background Checks or at any Particular Pace</u>.

Even assuming <u>arguendo</u>, that the jurisdiction stripping provisions of INA § 242 do not apply, the mandamus statute does not confer subject matter jurisdiction. The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." <u>Heckler v. Ringer</u>, 466 U.S. 602, 616 (1984). Mandamus relief is "a drastic one, to be invoked only in extraordinary situations." <u>Kerr v. United States District Court</u>, 426 U.S. 394, 402 (1976); <u>see</u> <u>also</u>, <u>Allied Chemical Corp. v. Daiflon, Inc.</u>, 449 U.S. 33, 34 (1980); <u>Giddings v. Chandler</u>, 979 F.2d 1104, 1008 (5th Cir. 1992). Mandamus is available only when a government agent or agency has a duty to perform a specific act. The duty must be plainly defined, non-discretionary, and free from doubt; the act must be purely ministerial. <u>Id</u>. An aggrieved party may not sue a federal agency when the agency action in question is committed to its discretion by law. <u>See</u> 5 U.S.C. § 701(a)(2).

Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes." <u>Cheney v. United States District Court</u>, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); <u>accord</u> <u>Allied Chemical Corp. v. Daiflon</u>, Inc., 449 U.S. 33, 34 (1980); <u>Will v. United States</u>, 389 U.S. 90, 95 (1967); <u>Bankers Life & Cas. Co. v. Holland</u>, 346 U.S. 379, 382-385 (1953). A writ of mandamus may only issue if three elements are met: "(1) the

petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available." In re First Federal Sav. & Loan Ass'n of Durham, 860 F.2d 135, 138 (4th Cir. 1988). Accord Rios v. Ziglar, 398 F.3d 1201, 1206 (10th Cir.2005); Nyaga v. Aschcroft, 323 F.3d 906, 911 (11th Cir. 2003). As the Supreme Court has explained, the plaintiff's right to the relief sought must be "clear and indisputable," Allied Chemical, 449 U.S. at 35, and the defendant must owe the plaintiff "a clear non-discretionary duty." Heckler v. Ringer, 466 U.S. at 616-17 (1984); see also In re First Federal Sav. & Loan, 860 F.2d at 138 ("Mandamus against a public official will not lie unless the alleged duty to act involves a mandatory or ministerial obligation which is so plainly prescribed as to be free of doubt.").

Here, Plaintiff lacks a clear right to immediate adjudication, and Defendant has no clear mandatory or ministerial obligation to adjudicate the application within a particular time frame. Safadi v. Howard, 466 F.Supp.2d at 700. The decision whether to grant or deny Plaintiff's adjustment application is plainly discretionary by statute. See 8 U.S.C. § 1255(a). Surely, part of USCIS's discretion in adjudicating an adjustment application includes ensuring that immigration benefits are not conferred to an alien ineligible for a benefit due to fraud, criminal convictions, or national security matters, and determining when the background checks are satisfactorily complete. Accordingly, there are no statutory provisions or regulations that mandate the adjudication of adjustment applications within a particular time frame. Consequently, USCIS has no clear, mandatory duty to adjudicate Plaintiff's application prior to completion of background checks in order to meet a prescribed deadline.

For these reasons, district courts have routinely found that mandamus relief is unavailable to compel immediate adjudication of applications for adjustment of status. Safadi

14

v. Howard, 466 F.Supp.2d at 700; Saleh v. Ridge, 367 F.Supp.2d 508, 511 (S.D.N.Y. 2005)

("The Court therefore lacks subject matter jurisdiction to compel agency action by writ of

mandamus in this case."); Karan v. McElroy, No. 02 Civ. 6678(JGK), 2003 WL 21209769, at *1

(S.D.N.Y. May 23, 2003) ("[B]ecause decisions regarding the plaintiff's immigration status are

committed to the discretion of the INS, this Court lacks the authority under . . . the mandamus

statute. . . to grant the relief the plaintiff seeks."); Zheng v. Reno, 166 F.Supp.2d 875, 880-81

(S.D.N.Y. 2001); Sadowski v. INS, 107 F.Supp.2d 451, 453 (S.D.N.Y. 2000); see also Rahman

v. McElroy, 884 F.Supp. 782, 787 (S.D.N.Y. 1995).  As the district court in Saleh noted,

"[a]djustment of immigration status . . . is a discretionary act, and therefore, [i]n keeping with

the plain language [of 8 U.S.C. § 1255(a)], courts have consistently found mandamus

inappropriate in actions based on the government's failure to adjust an applicant's status."  Saleh,

367 F.Supp.2d at 508 (brackets original, internal quotation marks omitted).

　　　In sum, because the timing of the adjudication of Plaintiff's adjustment of status

application is not "subject to positive command, plainly described and free from doubt," Plaintiff

is not entitled to the extraordinary relief of mandamus.  Rahman, 884 F.Supp. at 787.  The Court

thus lacks subject matter jurisdiction to issue the writ.

　　　　　3.　　　The APA Precludes This Court From Reviewing Plaintiff's Claim Because
　　　　　　　　　it Concerns Action that is Committed to Agency Discretion.

　　　The APA does not, however, entitle a person "adversely affected or aggrieved by agency

action" to judicial review, see § 702, where another statute precludes judicial review or "agency

action is committed to agency discretion by law."  See § 701(a)(2); Brock v. Pierce County, 476

U.S. 253, 260 n.7 (1986).  "The principle purpose of the APA limitations . . . and of the

traditional limitations upon mandamus from which they were derived—is to protect agencies

from undue judicial interference with his lawful discretion . . . ." Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004). Here, § 701(a)(2) precludes judicial review over Plaintiff's claims because the adjudication of I-485 adjustment applications is committed to agency discretion. See Safadi v. Howard, 466 F.Supp.2d at 700.

The APA itself does not confer jurisdiction on a district court to review the decision of an administrative agency. Califano v. Sanders, 430 U.S. 99, 107 (1977). However, a district court may have subject matter jurisdiction under 28 U.S.C. § 1331 over a claim that an agency has violated the APA, if the claim is not "wholly insubstantial and frivolous" or "patently without merit." Bell v. Hood, 327 U.S. 678, 682-84 (1946).

Even where subject matter jurisdiction to review an APA claim exists, however, a claim is nevertheless unreviewable by the courts if the relevant agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "Agency action" is defined under the APA to include a "failure to act." 5 U.S.C. § 551(13). In Heckler v. Chaney, supra, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830. As the Court went on to explain, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" Id.; see also Collins Music Co. v. United States, 21 F.3d 1330, 1335 (4th Cir. 1994).

As explained above, the adjudication of an adjustment of status application is expressly committed to agency discretion. See 8 U.S.C. § 1255(a) (an alien's status "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe") (emphasis added). Moreover, no statutory or regulatory provisions provide a "meaningful

standard" against which to measure USCIS's process of adjudicating such an application.

<u>Heckler</u>, 470 U.S. at 830.  Rather, the agency maintains complete discretion to determine, not only whether to adjudicate the adjustment application, but also "how and when" to do so.  <u>Id.</u>  In contrast with certain other immigration provisions, <u>e.g.</u>, 8 U.S.C. § 1447(b) (requiring adjudication of naturalization applications 120 days after examination), the statute and regulations governing Plaintiff's adjustment of status application provide no time frame for when such an application must be adjudicated.  <u>See</u> <u>Zheng v. Reno</u>, 166 F.Supp.2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]").  Consequently, there is no standard against which the Court can measure whether the Agency has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id. § 706(1).

In the absence of a specified time frame for adjudication, other courts have found that claims relating to alleged delays in the process of adjudicating an adjustment of status application are unreviewable under the APA.  <u>See</u> <u>Zheng</u>, 166 F.Supp.2d at 878-89; <u>Karan v. McElroy</u>, <u>supra</u>, at *1 ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff seeks."); <u>see also</u> <u>Rahman v. McElroy</u>, 884 F.Supp. at 787-88.   In addition, at least two Supreme Court cases suggest the importance of a specified time period in allowing a court to compel agency action that is "unreasonably delayed" under § 706(1).  <u>See</u> <u>Norton v. Southern Utah Wilderness Alliance</u>, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period . . . a court can compel the agency to act . . . ."); <u>Brock v. Pierce County</u>, 476 U.S. at 260 n.7 (finding that because "the statutory command that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's

17

discretion, . . . [t]he court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

Without any mandatory time frame to adjudicate Plaintiff's claim that USCIS has "unreasonably delayed" adjudication of his application, this Court would have to create a temporal standard out of whole cloth. This is a perilous task given the national security considerations that affect USCIS's adjudicative process. Moreover, as other courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies.'" Rahman, 884 F.Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler v. Chaney, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities").

Accordingly, the Court should find that 8 U.S.C. § 701(a)(2) precludes review of the agency's adjudicative process, because it is committed to agency discretion by law.

Moreover, Plaintiff has available administrative remedies to seek redress if the application is denied. As federal regulations make clear: "[n]o appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 C.F.R. § 245.2(a)(1) [i.e., removal proceedings]. 8 C.F.R. § 245.2(a)(5)(ii). See also AUSTIN T. FRAGOMEN, JR., ET AL., IMMIGRATION PROCEDURES HANDBOOK 13-91 (1999) ("There is no direct appeal from [an adjustment of status] denial. . . . If the alien believes that the adjustment application was wrongly denied, he or she has the right to reapply for adjustment of status as a part of deportation proceedings brought against him or her by the INS [and thereafter the] alien has a right to appeal the denial of an

18

adjustment application when . . . made during a removal proceeding.").

Even if 5 U.S.C. § 555(b) (requiring agency action within a reasonable time) can be construed as a statute that renders Defendants' actions reviewable under § 1331, the Complaint is devoid of factual allegations that demonstrate unreasonable delay in acting upon Plaintiff's application.  See Uckan v. Chertoff, No. 3:05-CV-2502-P (N.D. Tex. December 19, 2006) (holding that four years is not an unreasonable delay for a pending naturalization application awaiting completion of a background check); Safadi v. Howard, supra at 700-01 (nearly four year delay was not so unreasonable as to be tantamount to a refusal to process the application); Jabr v. Chertoff, 2006 WL 3392504 (E.D. Mo. Nov. 21, 2006)(more than two years since adjustment application filed).  While Plaintiff would like immediate adjudication of the application, there is no statutory support warranting such relief.  Therefore, should the Court find that 5 U.S.C. §555(b) confers subject matter jurisdiction over this matter, dismissal is proper for failure to state a claim under Rule 12(b)(6).

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss this case for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and/or for failure to state a claim pursuant to Rule 12(b)(6).

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
                    /s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney




_____
                    /s/
ALEXANDER D. SHOAIBI, D.C. Bar #423587
Assistant United States Attorney
555 4th Street, N.W. Rm. E 4218
Washington, D.C. 20530

20

## CERTIFICATE OF SERVICE

I hereby certify that on this __**23rd**__ day of April, 2007, I caused the foregoing **Defendant's Motion to Dismiss and Memorandum in Support thereof** to be served on plaintiff's counsel postage prepaid, addressed as follows:

> Thomas A. Elliot
> Elliot and Mayock, LLP
> 1629 K Street, NW 12th floor
> Washington, DC 20006-1641
>
> Lawrence H. Rudnick
> Steel, Rudnick and Ruben
> 1608 Walnut Street, Suite 1500
> Philadelphia, PA 19103


> ___/s/_____
> ALEXANDER D. SHOAIBI
> Assistant United States Attorney

21

1
2
3                        UNITED STATES DISTRICT COURT
4                        FOR THE DISTRICT OF COLUMBIA
5
6    Zaigang Liu,                          )   Case No.: 1:07CV00263
                                           )
7              Plaintiff,                   )
                                           )
        vs.                                )   Declaration of Bradley J. Brouillette
8                                          )
9    Paul Novak, Director, Vermont Service Center )
     U.S Department of Homeland Security, U.S. )
     Citizenship and Immigration Services; Emilio )
10   Gonzalez, Director, U.S. Citizenship and )
     Immigration Services; Robert S. Mueller, III,
11   Director, Federal Bureau of Investigation,
12
13   _____ Defendants _____
14   I, BRADLEY J. BROUILLETTE declare as follows:

15   1.     I am employed by the United States Citizenship and Immigration Services (hereinafter

16          "USCIS") as a Supervisory Center Adjudications Officer at the Vermont Service Center

17          (hereinafter "VSC"), in St. Albans, Vermont.  I have held this position since December

18          2003.  I have been employed by the agency in various capacities since November 1995.  I

19          make this declaration based on my personal knowledge and my review of official

20          documents and records maintained by the USCIS.  If called to testify, I could and would
21
22          do so competently.

23   2.     This declaration is submitted in support of Defendants' motion to dismiss in the case of

24          Zaigang Liu v. Novak et al., 1:07CV00263, now pending before the United States

25          District Court for the District of Columbia.  It provides a factual summary of the agency's

26          adjudication policy as well as a review of the plaintiff's file.
27

                                           1



3.    When a visa petition or other application seeking an immigration benefit on behalf of an alien is filed with USCIS, the agency conducts numerous mandatory criminal and national security background checks. These checks are conducted both to enhance national security and ensure the integrity of the immigration process. These security and background checks serve to screen out aliens who may seek to harm the United States and its citizens or who may be seeking immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. Pursuant to established agency policy, all required security checks must be completed prior to adjudication of the application.

4.    The attached Fact Sheet explains the different types of checks that must be completed. (See Fact Sheet, dated April 25, 2006, a true and correct copy of which is attached hereto as Exhibit 1). The checks include the FBI Name Check, FBI fingerprint check, and the DHS-managed Interagency Border Inspection System (IBIS). The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement agencies. Although in the majority of FBI name checks no matches are found, some cases involve complex or highly sensitive information and cannot be resolved quickly. The IBIS system contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI and other divisions of the U.S. Department of Justice, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies. It is a multi-agency effort with a central system that combines information from these various sources and databases to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. IBIS provides, but is not limited to, information related to persons who are wanted criminals, persons of interest in the context of national security, and other derogatory information, including adverse immigration history. While the

2

1    results of an IBIS query are usually available immediately, in some cases information

2    found will require further investigation. Finally, FBI fingerprint checks provide

3    information relating to criminal background within the United States. Results are

4    usually received within days and while the vast majority results in no criminal record,

5    positive results may have a direct bearing on the eligibility of an applicant for the

6    immigration benefit being sought.

7    5.   Once USCIS receives an I-485 a file is opened and an electronic record of that

8    application is created. Much of this initial electronic processing and data entry is

9    automated, including the automatic generation and electronic transmission of a FBI name

10   check request in FBIQUERY, the FBI repository and tracking system for FBI Name

11   Check requests. Once the initial file creation and processing of an I-485 application is

12   complete, each file is placed on an I-485 pending shelf for processing and adjudication in

13   chronological order according to date of receipt.

14

15   6.   Due to bi-specialization, the VSC no longer accepts any new I-485 applications. All

16   pending cases being held for FBI name and date of birth check clearance and Visa

17   Availability have been sent to the Texas Service Center. The VSC has retained

18   approximately 15,000 pending cases in which the adjudicative process had already begun

19   and the adjudication of those cases will be completed at the VSC.

20

21   7.   VSC periodically runs an electronic report in FBIQUERY system for all files on the I-

22   485 pending shelf to confirm the successful transmission of the FBI Name Check request

23   and to identify those applications that have received responses from the FBI name checks

24   and FD-258 (fingerprints) and are thus ready for adjudication. FBI name check requests

25   that have been received by the FBI but have not yet been completed are indicated by a

26   notation of "Pending" in FBIQUERY. An FBI Name Check that has been completed will

27

3

1    be indicated by various entries depending on the result, including No Record, Positive

2    Response, etc.

3    8.    This report will also identify those I-485 applications that have received a "No Data" or

4    "Error" response in FBIQUERY indicating a problem with transmission of the name

5    check request from USCIS to the FBI. If such a problem is reported, the FBI name check

6    requests will then be initiated a second time and resent manually or electronically to the

7    FBI for a response. In this way USCIS ensures that the FBI has in fact received all

8    requests for name checks.

9

10    9.    All files on the FBI Name Check Shelf are audited regularly in order to identify those in

11    which a response from the FBI has been received. This audit is conducted at least every

12    three weeks or more often. In this manner the agency ensures that as FBI responses are

13    received, files are expeditiously released for adjudication. FBIQUERY reports do not

14    provide USCIS with any indication as to what information the FBI may have relating to a

15    particular alien, whether an FBI investigation into the particular alien has been

16    undertaken, or whether there are national security concerns relating to that alien.

17

18    10.    For most applicants, USCIS can quickly determine if there are criminal or security

19    related issues in the applicant's background that affect eligibility for immigration

20    benefits. However, due both to the sheer volume of security checks USCIS conducts,

21    and the fact that USCIS must await responses from the FBI or other relevant agencies

22    that conduct some of the required security checks, some delays on individual

23    applications are unavoidable and may be lengthy. Moreover, in some cases a

24    background or security check will reveal that positive (derogatory) information on the

25    subject alien is possessed by some agency other than USCIS without necessarily

26    revealing the substance of that information. In such cases, USCIS works closely with

27    the other law enforcement or intelligence agencies to obtain all available information

4

1    concerning the positive result in order to properly evaluate its significance. Even where

2    the FBI or a third agency has provided a final response, a case may still be considered

3    pending where the response requires further investigation or review by USCIS or

4    another agency.   It is vitally important to thoroughly screen each applicant in order to

5    resolve all concerns of a law enforcement or national security nature before determining

6    that an individual is eligible for an immigration benefit.

7    11.    The agency's policy for requesting expedited security checks requires that the applicant

8    meet one of the following criteria:

9        1.   Military Deployment.

10       2.   Age-out cases not covered by the Child Status Protection Act and applications

11          affected by sunset provisions such as the Diversity Visa Program.

12

13       3.   Compelling reasons provided by the requesting office such as critical medical

14          conditions.

15       4.   Loss of Social Security benefits or other subsistence at the discretion of the

16          Director.

17   U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the

18   FBI to expedite a name check when the only reason for the request is that a mandamus

19   (or other federal court petition) is filed in the case.

20

21   12.    USCIS reports the average processing times for specific applications and petitions on the

22   USCIS website.  This information reflects only average processing times on the date the

23   ·information is published.  Average processing times fluctuate widely and will sometimes

24   even regress for a specific form type due to a number of factors, including a reallocation

25   of agency resources, reordering of the agency's priorities, and other reasons.

26   Additionally, not every application will require the same level of inquiry.  Some may

27

1    require a more detailed level of review and or investigation from either the USCIS or

2    other agencies for a number of reasons ranging from the alien's eligibility for the benefit

3    sought to national security concerns.  Accordingly, even when it appears that the

4    adjudication of a particular application is outside the average processing time, this does

5    not establish that the delay is unreasonable or even due to factors within the control of

6    USCIS.

7

8    13.    The FBI has an established process of processing FBI Name Check requests from USCIS

9    chronologically based on the date the request is forwarded.  As stated above, certain

10    requests can be expedited if they meet specific expedite criteria.  However, it is important

11    to note that whenever a particular application or petition receives expedited processing

12    and is moved up in the queue, it is at the expense of those still unadjudicated petitions or

13    applications that bear an earlier filing date.  There is no statutory or regulatory time limit

14    for the adjudication of I-485s.  Moreover, an alien who has applied for adjustment of

15    status may apply for and obtain employment authorization for the entire time his or her

16    application is pending. Most applicants for adjustment of status may also apply for and

17    obtain advance parole to enable them to travel abroad during the pendency of their

18    application.  Thus, applicants for adjustment of status are not as adversely affected by

19    delays in the adjudication of their applications as are aliens filing for other immigration

20    benefits.

21

22    14.    In my capacity as a Supervisory Center Adjudications Officer at the VSC, I have access

23    to the official files and records of the USCIS.  I have reviewed the system records for

24    plaintiff LIU, Zaigang, A97 486 586.  The record reflects that on July 23, 2003, plaintiff

25    Liu filed an application for adjustment of status to permanent resident on Form I-485.

26

27

6

1    Plaintiff seeks adjustment as a derivative beneficiary on an approved I-140 employment

2    based visa petition for his spouse Lu Zhang. To date, plaintiff's application remains

3    pending the completion of security checks. Once the required security checks are

4    completed, the plaintiff's application will be adjudicated.

5

6    15.   Because the plaintiff's case does not meet one of the above-mentioned expedite criteria,

7          the agency is unable to request an expedite of the security check clearance on his behalf.

8          For this reason the USCIS cannot adjudicate plaintiff's I-485 application for adjustment

9          of status until such time as all security checks are complete.

10

11         I declare under penalty of perjury that the foregoing is true and correct. Executed this

12    23rd day of April, 2007 at St. Albans, Vermont.

13

14

15

16    Bradley J Brouillette
      Supervisory Center Adjudications Officer

17    Vermont Service Center

18

19

20

21

22

23

24

25

26

27

7

*Press Office*
**U.S. Department of Homeland Security**



**U.S. Citizenship
and Immigration
Services**

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

Immigration Security Checks—How and Why the Process Works

---

### How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

---

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ZIAGANG LIU,                    )
                               )
            Plaintiff,         )
                               )
      v.                       )           Case No:
                               )           07-CV-00263
PAUL NOVAK,                    )
            et al.,            )
                               )
            Defendants.        )

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program
Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C.
I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name
Check Units. The statements contained in this declaration are based upon my personal
knowledge, upon information provided to me in my official capacity, and upon conclusions and
determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures
followed by the FBI in responding to requests for information from its files pursuant to the policy
and the procedures of the United States Citizenship and Immigration Services ("USCIS").
Specifically, I am aware of the name check request for Zaigang Liu, the plaintiff in this civil
action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of
disseminating information from the FBI's Central Records System in response to requests
submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign



police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7) Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8) The entries in the General Indices fall into two categories:

(a) "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b) "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9) In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a) Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b) Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

computerized system. All serials originated by the Office
of Origin are maintained in the Office of Origin's case file.

(c)    Universal Index: This application, sometimes referred to as
"UNI", continues the universal concepts of the ACS system
by providing a complete subject/case index to all
investigative and administrative cases. Only the Office of
Origin is required to index. However, the Lead Offices
may index additional information as needed. The Universal
Index, which consists of an index of approximately 98.2
million records, functions to index names to cases, and to
search names and cases for use in the FBI investigative and
administrative cases. Names of individuals or entities are
recorded with identifying information such as the date or
place of birth, race, sex, locality, social security number,
address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the investigative FBI Special Agent, the supervisor in the field

division conducting the investigation, and the supervising FBI Special Agent at FBI

Headquarters. The FBI does not index every name in its files, but indexes only that information

considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this

mass information, information essential to ongoing investigations could not be readily retrieved.

The FBI files would thus be merely archival in nature and could not be effectively used to serve

the mandated mission of the FBI, which is to investigate violations of federal criminal statutes.

Therefore, the General Indices to the CRS files are the means by which the FBI can determine

what retrievable information, if any, the FBI may have in its CRS files on a particular subject

matter.

(11)    When the FBI searches a person's name, the name is electronically

checked against the FBI's Universal Index. The searches seek all instances of the individual's

name, social security number, and dates close to his or her date of birth, whether a main file or

reference. As previously stated, any "main" file name would be that of an individual who is,

himself or herself, the subject of an FBI investigation, whereas any "reference" would be an

individual whose name appears as part of an FBI investigation. For example, "references"

include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)     If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)     Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)     For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an

5

existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

6

Act required background investigations. Those 2.7 million requests were in addition to the
regular submissions by the former INS. Currently, the FBI has returned an initial response to all
2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to
those resubmitted requests indicated that the FBI had no information relating to the specific
individual who was the subject of the request, approximately 16 percent – or over 440,000 –
resubmitted requests indicated that the FBI <u>may</u> have information relating to the subject of the
inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)    The FBI's processing of those 440,000 resubmissions has delayed the
processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name
check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check
be expedited.

(20)    The FBI cannot provide a specific or general time frame for completing
any particular name check submitted by USCIS. The processing of name checks, including those
which are expedited, depends upon a number of factors, including where in the processing queue
the name check lies; the workload of the analyst processing the name check; the volume of
priority checks the analyst must process for, among others, military call-ups, medical
emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (<u>i.e.</u>, possible
matches) that must be retrieved, reviewed and resolved; the number of records from various Field
Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and
resources available to conduct the checks. While the FBI is sensitive to the impact of the delays
in processing name check requests, the consequence of the FBI's mission on homeland security
requires that its name check process be primarily focused on providing accurate and thorough
results. When the name check is completed, the FBI provides the results to USCIS as quickly as
possible.

(21)    It is important to note that the FBI does not adjudicate applications for
benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a
summary of available information to USCIS for its adjudication process.

## PLAINTIFF'S NAME CHECK REQUEST

(22)   The name check request for plaintiff Zaigang Liu was received by the FBI from USCIS on or about March 30, 2004, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _13th_ day of April 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8

_____UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ZAIGANG LIU,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **C.A. NO. 07-263 (EGS)** |
| ) | |
| **PAUL NOVAK, DIRECTOR, VERMONT** ) | |
| **SERVICE CENTER, U.S. DEPARTMENT OF** ) | |
| **HOMELAND SECURITY (DHS), U.S.** ) | |
| **CITIZENSHIP AND IMMIGRATION** ) | |
| **SERVICES (USCIS); EMILIO GONZALES,** ) | |
| **DIRECTOR USCIS; ROBERT MUELLER,** ) | |
| **DIRECTOR, FEDERAL BUREAU OF** ) | |
| **INVESTIGATION (FBI),** ) | |
| ) | |
| **Defendants.** ) | |

_____ **ORDER**

Upon consideration of Defendant's Motion to Dismiss, and the opposition thereto, and

the Court having considered the entire record herein, it is hereby,

**ORDERED** that Defendant's motion is GRANTED, and it is further

**ORDERED** that judgment shall be entered for Defendant, and that this matter is hereby

**DISMISSED WITH PREJUDICE.**

This is a final, appealable order.

Dated this _____ day of _____, 2007.

_____
Emmet G. Sullivan
United States District Judge